## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **RICHARD HUBBARD III** | ) **CASE NO.:  1:18-CV-02252** |
| **5333 Northfield Road, #300** | ) |
| **Bedford Heights, OHIO  44146,** | ) **JUDGE DAN AARON POLSTER** |
| | ) |
| **-and-** | ) |
| | ) **PLAINTIFFS' FIRST AMENDED** |
| **YOLIMAR TIRADO** | ) **COMPLAINT** |
| **5333 Northfield Road, #300** | ) |
| **Bedford Heights, OHIO  44146** | ) |
| **Plaintiffs,** | ) |
| | ) **JURY DEMAND ENDORSED** |
| **-vs-** | ) **HEREON** |
| | ) |
| **CITY OF EUCLID** | ) |
| **585 E. 222nd /St.** | ) |
| **Euclid, Ohio  44123** | ) |
| | ) |
| **-and-** | ) |
| | ) |
| **Euclid Police Officer** | ) |
| **MICHAEL AMIOTT** | ) |
| **585 E. 222nd /St.** | ) |
| **Euclid, Ohio  44123** | ) |
| | ) |
| **-and-** | ) |
| | ) |
| **Euclid Police Officer** | ) |
| **MATT GILMER** | ) |
| **585 E. 222nd /St.** | ) |
| **Euclid, Ohio  44123** | ) |
| | ) |
| **-and-** | ) |
| | ) |
| | ) |

1

| | |
|---|---|
| **Euclid Police Officer** | **)** |
| **KIRK PAVKOV** | **)** |
| **585 E. 222nd /St.** | **)** |
| **Euclid, Ohio  44123** | **)** |
| | **)** |
| **Defendants.** | |

Euclid police Officer Michael Amiott, in concert with several Defendant Police Officers brutally assaulted and menaced Richard Hubbard and Yolimar Tirado on August 12, 2017. This attack was captured on a cell-phone video recording which went viral; sparking outrage and protest nationally.

This is a civil rights actions for the violations against Plaintiff's Hubbard and Tirado arising from the egregious conduct of these Defendant Officers, and the City of Euclid's failure to train, supervise, and discipline its police officers in order to bring them within the guidelines of constitutional police practices.

Defendant Officers are responsible for injuring Plaintiffs. Further, the unconstitutional policies and practices of the Euclid Police Department have resulted in the excessive use of force against too many citizens of Euclid, Ohio, particularly the class of African-American citizens, of which Plaintiff Hubbard is a member. The City is therefore also liable for Plaintiffs' injuries.

## **JURISDICTION AND VENUE**

1.     This action is brought pursuant to claims arising under the laws of the State of Ohio, 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the

United States Constitution. This action is also brought pursuant to 28 U.S.C. §§ 1983, 1985 and 1988 as it is also an action for compensatory damages, punitive damages, and attorney fees.

2.     Venue is proper in this as the parties reside, or at the time the events took place, resided in this judicial district, and the events giving rise to Plaintiffs' claims also occurred in this judicial district.

## PARTIES

3.     Plaintiff, Richard Hubbard III ("Plaintiff Hubbard"), is an Ohio citizen, with permanent residence in Cleveland, Cuyahoga County, Ohio.

4.     Plaintiff, Yolimar Tirado ("Plaintiff Tirado"), is an Ohio citizen, with permanent residence in Cleveland, Cuyahoga County, Ohio.

5.     Defendant Michael Amiott ("Defendant Amiott") was, at the time of this occurrence, a duly appointed officer employed by the City of Euclid and engaged in the conduct complained of in the course and scope of his employment with the City of Euclid.

6.     Defendant Matt Gilmer ("Defendant Gilmer") was, at the time of this occurrence, a duly appointed officer employed by the City of Euclid and engaged in the conduct complained of in the course and scope of his employment with the City of Euclid.

7.     Defendant Kirk Pavkov ("Defendant Pavkov") was, at the time of this

occurrence, a duly appointed officer employed by the City of Euclid and engaged in the conduct complained of in the course and scope of his employment with the City of Euclid.

8.     At the times material to this complaint, Defendant Amiott, Defendant Gilmer and Defendant Pavkov (hereinafter collectively referred to as "Defendant Officers"), were acting under color of state law, ordinance, and/or regulation. Each is being sued in their individual capacity.

9.     Defendant City of Euclid ("Defendant City") is a municipal corporation, duly incorporated under the laws of the State of Ohio, is the employer and principal of Defendant Officers, and is responsible for the policies, practices and customs of its Police Department and City Council.

## FACTS

10.    On Saturday, August 12th, 2017, around 10 AM, several social justice organizations and activists, including Black Lives Matter Cleveland, and Showing Up for Racial Justice ("SURJ"), were canvassing the neighborhoods of Euclid, Ohio in the vicinity of Euclid Memorial Park. These organization were distributing literature to Euclid residents, in conjunction with the family of Luke Stewart.[1] Several unidentified police officers, in Euclid Police Department Vehicles, were observed cruising through

---

[1] Luke Stewart was an unarmed 23-year-old, black, male resident of Euclid, who was gunned down on March 13, 2017 by Patrolman Matthew Rhodes of the Euclid Police Department. His death was the subject of another § 1983 civil suit against the City of Euclid in the Northern district of Ohio, Case No. 1:17-cv-02122-JG.

the area of the volunteers.

11.     Plaintiffs Richard Hubbard and Yolimar Tirado are a romantic item. Plaintiffs left their residence early that morning, intending to run several errands for the day before attending a family reunion.

12.     Plaintiffs were driving Yolimar's car, a silver 2011 Hyundai Sonata; Plaintiff Hubbard drove, with Plaintiff Tirado the sole passenger in the vehicle.

13.     Plaintiffs' route led them to Lakeshore Boulevard; less than one mile away from Euclid Memorial park, and within the gambit of the Defendant Officers' patrol on this fateful day.

14.     Defendant Amiott allegedly observed Defendant Richard Hubbard fail to come to a complete stop behind a stop bar on E. 228th Street.[2] Based on the stop bar infraction, Defendant Amiott commenced to pull Plaintiffs over on E. 228th Street.[3]

15.     Plaintiffs came to an immediate stop on E. 228th Street upon seeing Defendant Amiott activate his siren. Defendant Gilmer arrived at the scene immediately thereafter. Defendant Amiott approached Plaintiff's vehicle from the driver side, and Defendant Gilmer approached the vehicle from the passenger side.

16.     As the Defendant Officers approached the vehicle, Plaintiff Hubbard

---

[2] Prior to these events, Defendant Michael Amiott was personally instructed, with specificity, to refrain from pulling over motorists for failing to come to a complete stop behind stop bars by CPT. Kevin Kelly of the Euclid Police Department.

[3] Plaintiffs deny having committed a red light infraction. The light in question was green, and turned yellow as Plaintiff Hubbard was beginning to turn. Plaintiff Hubbard was doing the speed limit prior to signaling his right turn, and stopped completely for three seconds at the light before turning right.

removed his seatbelt and placed his hands on the steering wheel. The traffic stop commenced with mutual courtesy, as Defendant Amiott and Plaintiff Hubbard exchanged morning greetings. Nevertheless, Defendant Amiott immediately began to clutch his service weapon upon talking to the Plaintiff couple.

17.     The conversation became contentious when Plaintiff Hubbard inquired as to why he was pulled over. Defendant Amiott stated that he pulled Plaintiffs over because of the stop bar infraction, and also that the registered owner was showing a suspended drivers' license status in the police database computer.

18.     Plaintiff Hubbard asked for an explanation as to what exactly a stop bar infraction entails, But Defendant Amiott did not explain the relevant facts to Plaintiffs at that time. Plaintiff Hubbard grew apprehensive upon not receiving an adequate explanation, and suspected that he had been racially profiled by the Euclid Police Department.[4] Defendant Amiott merely responded that his partner 'called them out.'

19.     Defendant Amiott proceeded to ask Plaintiff Hubbard his name, and Plaintiff complied. Defendant Amiott then asked Plaintiff Hubbard to spell his name, and again Plaintiff Hubbard complied.

20.     Defendant Amiott then asked Plaintiff Hubbard to whom was the vehicle registered, and whether or not he had any warrants. At this time, Plaintiff Tirado

---

[4] Plaintiffs observed several cars drive by the Defendant Officers without incident, and maintain that they were driving the speed limit and obeying all traffic lights and signs. This, in conjunction with observing the Defendant officers let several cars pass in front of them, observing the Defendant officers make menacing facial expressions at them, and ultimately stopping their vehicle, gave rise to an inference that they were being selectively targeted for law enforcement.

6

attempted to tender her registration, proof of insurance, as well as her license to

Defendant Amiott. Plaintiff Hubbard also tried to give Defendant Amiott paperwork

showing he had no warrants and had taken care of a prior Driving Under Suspension fine.

Nevertheless, despite his inquiries into these subjects, Defendant Amiott did not even

look at the documentation which Plaintiffs tendered in an effort to fully comply with

Defendant Amiott's requests.

21.     Defendant Amiott then instructed Plaintiff Hubbard to turn off the car

engine, and Plaintiff Hubbard complied with this request immediately. Next, Defendant

Amiott asked Plaintiff Hubbard to hand him the car keys. At this point, Plaintiff Hubbard

again asks where was he supposed to stop regarding the stop bar, and for what purpose

Defendant Amiott required the keys to automobile.

22.     Without any further explanation, Amiott sternly asks Plaintiff Hubbard to

hand him the keys. Plaintiff Hubbard immediately complied with this second request for

the car keys.

23.     Defendant Amiott then asked Plaintiff Hubbard for his drivers' license.

Plaintiff Hubbard reached into his pocket, and pulled out some cash money, and handed it

over to Plaintiff Tirado for safe-keeping. Defendants Amiott and Gilmer both remarked

about the size of the bankroll. Plaintiff Hubbard then presented his state identification

credentials to Defendant Amiott, who placed them on the roof of the vehicle.

24.     Defendant Amiott next asked Plaintiff Hubbard to "step out," with no

explanation as to the reason for the request. Plaintiff Hubbard again complies, and unlocks the door.

25.     As Plaintiff Hubbard opened the car door and began to step out of the vehicle as instructed, Defendant Amiott did not move away from the vehicle at all, depriving Plaintiff Hubbard of the required space to exit, and turn around, without making contact with Defendant Amiott's body.

26.     As Plaintiff Hubbard was beginning to exit the car, Defendant Amiott told him to "face away" from him. Plaintiff Hubbard then promptly exited the vehicle; his face only mere inches away from Defendant Amiott, due to the fact that Defendant Amiott had never taken a step away from the vehicle door to give Plaintiff any space.

27.     Less than one second after his first verbal command, Amiott again orders Plaintiff Hubbard to "face away." Again, Plaintiff Hubbard complies with this request, and begins to turn around away from Defendant Amiott.

28.     Before Plaintiff Hubbard could finish turning, Defendant Amiott forcefully pushed him against the car, causing Plaintiff Hubbard to lose his balance, with Plaintiff Hubbard's momentum carrying him backward. Defendant Amiott then grabbed Plaintiff Hubbard's neck in a clench, and attempted to trip him.

29.     As Plaintiff Hubbard attempted to sturdy himself in the midst of this violent assault, Defendant Amiott began to knee and kick Plaintiff Hubbard repeatedly. Plaintiff Hubbard tried to avoid Defendant Amiott's strikes, and pleaded with Defendant

Amiott to stop his assault, and take him into custody peacefully. Nevertheless, Defendant Amiott would not relent, and continued striking Plaintiff Hubbard, and attempting to wrestle him to the ground.

30. At this point, Defendant Gilmer communicates over his police radio that the Defendant officers have "got one resisting," and runs over to the struggle, and immediately deploys his taser on Plaintiff Hubbard, while Defendant Officer Amiott was still clenching Plaintiff Hubbard. As a result, both Plaintiff Hubbard and Defendant Amiott were thrown to the ground. Plaintiff Hubbard screamed in agony as a result of having been tasered.

31. Defendant Gilmer then proceeded to achieve a side-mount position upon Plaintiff Hubbard, as Plaintiff continued to scream and writhe in pain from the taser.

32. Defendant Amiott then commenced a violent series of punches to Plaintiff Hubbard's head and face, as Defendant Gilmer continued to hold Plaintiff down.

33. Plaintiff Tirado grew frightened by the carnage unfolding before her eyes, exited the vehicle, and began imploring the Defendant Officers to stop their attack upon her boyfriend. Defendant Gilmer then momentarily disengaged from assault to order Plaintiff Tirado to "get back!"

34. Defendant Amiott capitalized on Defendant Gilmer's temporary retreat from the fracas and advanced his position to achieve a full mount upon Plaintiff Hubbard; pinning Plaintiff's legs between his own, and rendering him unable to turn over onto his

stomach.

35.     Defendant Amiott then escalated his attack by lifting Plaintiff Hubbard's head, and violently slamming his skull against the pavement with the full weight of his body.

36.     Defendant Amiott remained silent during his assault upon Plaintiff Hubbard. Defendant Amiott did not order Plaintiff to roll over, provide any other directive to allow Plaintiff Hubbard a reprieve from his beating, or take any measure whatsoever to de-escalate the situation.

37.     Defendant Amiott then commenced to choking Plaintiff Hubbard with his arms. At this point, Defendant Gilmer began patting Defendant Amiott on the back.

38.     Plaintiff Hubbard began to lose consciousness as a result of the chokehold applied by Defendant Amiott. Plaintiff Hubbard began to lose consciousness several times during this attack, only to be revived by Defendant Amiott's punches. Defendant Amiott began smirking with pleasure as he continued to reign down blows upon Plaintiff Hubbard.

39.     Defendant Officers began to exclaim that Plaintiff Hubbard was reaching for a gun upon his person. Plaintiff Tirado's terror grew even greater, as she now believed the Defendant Officers were going to shoot Plaintiff Hubbard right before her eyes. Plaintiff Tirado immediately yelled at the Defendant Officers that Plaintiff Hubbard was unarmed, and then retrieved her cell-phone from the vehicle in order to record the

events.

40.     Plaintiff Hubbard continued to try and roll over onto his stomach, but the Defendant Officers were still pinning his legs to the ground. Plaintiff Hubbard folded his arms over his face, and tried to sway away from Defendant Amiott's punches and elbows, in an act of reflexive self-preservation. At no time did Plaintiff Hubbard attempt to strike, or otherwise harm Defendant Officers.

41.     Plaintiff Tirado continued recording the assault as the Defendant Officers escalated their attack on Plaintiff Hubbard. Plaintiff Tirado moved approximately five feet away from the fracas, and continued to beg for the Defendant Officers to stop beating her boyfriend.

42.     Other Euclid Police Officers, including Defendant Pavkov, began to arrive at the scene. Defendant Pavkov kneed Plaintiff Hubbard in the head, and then assisted in wrenching Plaintiff Hubbard's arm behind his back causing significant pain to Plaintiff's shoulder. The Defendant Officers finally hand-cuffed Plaintiff Hubbard.

43.     Defendant Amiott finally noticed that Plaintiff Tirado was recording the arrest. Defendant Amiott then ordered Defendant Pavkov to arrest Plaintiff Tirado. As Defendant Pavkov proceeded towards Plaintiff Tirado, Plaintiff Tirado took several steps away from the scene, and placed her hands in the air. Defendant Pavkov then grabbed Plaintiff Tirado's arms, pushed her down to the ground, and handcuffed her. Plaintiff Tirado asked why she was being arrested, and Defendant Pavkov informed her she was

being arrested for disorderly conduct based on her shouting at the officers.

44.     There were now approximately fifteen bystanders observing the fracas, and at least four other citizens recording this event on their smartphones. The Defendant Officers ordered all of the bystanders to put down their phones and disperse.

45.     The Defendant Officers finally picked Plaintiff Hubbard off of the ground, and Defendant Gilmer escorted Plaintiff Hubbard to his patrol car. When Plaintiff Hubbard asked why he was beaten by the Defendant Officers, Defendant Gilmer told him he had tried to run away. Several witnesses at the scene who heard this exchanged chimed in, calling the Defendant Officers liars, and exclaiming that Plaintiff Hubbard had neither tried to flee, nor had he resisted the arrest.

46.     Plaintiff Hubbard continued to bleed profusely in the back of Patrolman Gilmer's patrol-car. Plaintiff Hubbard asked for medical treatment twice while in the backseat of the police cruiser, both of his requests were denied.

47.     Euclid EMS arrived on the scene and treated Defendant Amiott's hand injuries. Again Plaintiff Hubbard asked to be treated for his injuries, and again he was denied. Euclid EMS never provided any treatment for Plaintiff Hubbard, they never even triaged him or provided him with as much as a Band-Aid.

48.     After the arrest, the Defendant Officers searched and impounded Plaintiffs' vehicle. The police report claims that the Defendant Officers found marijuana in the vehicle. Nevertheless, no pictures of the marijuana were ever taken, no evidence of

marijuana was ever produced, and no charges were ever filed against Plaintiffs for automobile, in case #17 CRB 01462, and case #17 TRD 02240. All charges were dismissed Marijuana possession.

49.     After completing the arrest, members of the Euclid Police Department were observed by eyewitnesses fist-bumping one another, and laughing about the assault afterwards. One Euclid Police Officer, Daniel Ferritto, was recorded on the dispatch radio stating: "I didn't know we would be having this much fun."

50.     A cell-phone video of the arrest was uploaded onto social media, and quickly went viral. Shortly after arriving at the Euclid City Jail, the video had already been seen by millions of people, including some staff at the Euclid City Jail. After seeing the egregiousness of Plaintiff Hubbard's arrest, the staff at the Euclid City Jail began to treat Plaintiff Hubbard's injuries.

51.     Another employee at the Euclid City Jail showed the video to their supervisors, and Plaintiffs' bond was reduced based on the brutality of Plaintiff Hubbard's arrest.

52.     Plaintiff Hubbard was charged with resisting arrest, driving under suspension, and failure to obey a traffic signal in case #17 CRB 01464, and case #17 TRD 02238. All charges were dismissed against Plaintiff Hubbard on November 14, 2017.

53.     Plaintiff Tirado WAS charged with disorderly conduct, resisting an

13

officer, allowing another to drive without a license, and open container in an against

Plaintiff Tirado on November 14, 2017.

**FIRST CLAIM FOR RELIEF – 42 U.S.C. § 1983 Claim for Unconstitutional Search and Seizure**

54.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully rewritten herein.

55.    The actions of Defendant Officers, as alleged in the preceding paragraphs, violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution to be secure in their person against unreasonable searches and seizures, and their right to due process under the Fourteenth Amendment to the United States Constitution, and caused the injuries alleged in this complaint.

56.    The actions of Defendant Officers as alleged in this complaint were the direct and proximate cause of the constitutional violations set forth above and of Plaintiffs injuries.

57.    Defendant Officers acted under color of law and within the scope of his employment when he took these actions.

58.    As a direct and proximate cause of Defendant Officers' misconduct, Plaintiffs suffered and continue to suffer injury and damages as set forth in this complaint.

**SECOND CLAIM FOR RELIEF – 42 U.S.C. § 1983 Claim for Malicious Prosecution**

59.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully rewritten herein.

60.     In the manner described more fully above, Defendant Officers instigated, influenced, or participated in the decision to prosecute Plaintiffs, knowing there was no probable cause for the criminal prosecution.

61.     The charges were terminated in Plaintiffs' favor.

62.     Defendant Officers accused Plaintiffs of criminal activity knowing these accusations to be without genuine probable cause.

63.     Defendant Officers made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

64.     Defendant Officers engaged in arbitrary and conscience-shocking conduct that contravened fundamental canons of decency and fairness and violated Plaintiffs' substantive due process rights in violation of the Fourteenth and Fourth Amendments to the United States Constitution.

65.     Defendant Officers acted under color of state law and within the scope of his employment when he took these actions.

66.     As a direct and proximate cause of Defendant Officers' misconduct, Plaintiffs' suffered and continued to suffer injury and damages as set forth in this Complaint.

**THIRD CLAIM FOR RELIEF- 42 U.S.C. § 1983 Monell Policy Claim Against Defendant City of Euclid**

67.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully rewritten herein.

68.     The actions of Defendant Officers, as alleged above, were taken pursuant to one or more interrelated de facto policies (even if not official written edicts), practices and/or customs of civil rights violations and unconstitutional practices of the City of Euclid and its Police Department.

69.     The City of Euclid, at all times relevant herein, approved, authorized, and acquiesced in the unlawful and unconstitutional conduct of its respective employees and/or agents and consequently is directly liable for the acts of those agents, pursuant to 42 U.S.C. § 1983.

70.     Despite the facts and circumstances surrounding the arrest of Plaintiffs, that clearly demonstrate that the actions of Defendant Officers were unreasonable and unlawful, upon information and belief, the City of Euclid has failed to effectively investigate or impose any discipline on the Defendant Officers, other than Officer Amiott, for their illegal behavior.

71.     At all times material to this complaint, Defendant City and its Police Department had interrelated de facto policies, practices, and customs which included, *inter alia*:

    a.    The failure to properly hire, train, supervise, discipline, transfer, monitor, counsel and/or otherwise control City of Euclid police

officers who engage in unjustified use of excessive and
unreasonable force and malicious prosecution;

b.      The police code of silence;

c.      The encouragement of excessive and unreasonable force and
malicious prosecution, particularly against African-American
citizens;

d.      The failure to properly to properly investigate the use of excessive
and unreasonable force and malicious prosecution against civilians
by City of Euclid police officers;

e.      The failure to properly discipline, supervise, monitor, counsel or
otherwise control City of Euclid police officers who engage in
unjustified use of excessive and unreasonable force for malicious
prosecution; and/or

f.      The failure to properly train and supervise City of Euclid police
officers with regard to constitutionally sound measures regarding
the use of force when effecting an arrest.

72.     Recently, a slew of allegations of excessive force against Euclid police
officers have arisen, some of which are captured on video.

73.     Moreover, in *Mary Stewart v. City of Euclid*, N.D.Ohio No.
1:17-CV-02122-JG (Jul. 13, 2018), the Northern District of Ohio found the City of Euclid

to have a "blasé attitude toward excessive force training," and "a cavalier indifference" to use of force training.

74.     Indeed, and more specifically, the evidence in *Mary Stewart v. City of Euclid*, N.D.Ohio No. 1:17-CV-02122-JG (Jul. 13, 2018), established the following:

-     Other than whatever basics are taught to officers when they attend a police academy, the City's training seems to consist initially of simply reading the excessive force policy after advising officers to "pay attention."  The City then apparently follows that up with a barebones yearly test (which is the same every year) and yearly scenarios that each focus on a single genre of facts that might require the use of force.

-     The City does not seem to make any serious effort to track which scenarios individual officers were exposed to or ensure that the scenarios (over the course of several years) cover a comprehensive range of instances that might require the use of force.

-     ***Moreover, although the police department's training policy calls for a training committee to review training needs and set training objectives, the department apparently does not have such a committee***. (emphasis added)

-     The presentation materials used during at least one of the Euclid Police Department's in-service trainings display a disturbing tendency to trivialize the use of excessive force.  For instance, one slide contains the following graphic

18

showing an officer beating a prone and unarmed suspect with the caption

"[p]rotecting and serving the poop out of you."



- Another slide, which expressly discusses the department's use of

force policy, contains an image of two officers—one holding a shotgun, the other

holding a pistol—with furious expressions on their faces.  The caption on this

slide reads: "Bed bug! Bed bug on my shoe!"

- Yet another slide contains a link to a Chris Rock comedy routine

on YouTube entitled "How not to get your ass kicked by the police!"  During the

skit, Rock says:  "People in the black community . . . often worry that we might

be a victim of police brutality, so as a public service the Chris Rock Show proudly

presents: this educational video."; "Have you ever been face-to-face with a police officer and wondered: is he about to kick my ass? Well wonder no more. If you follow these easy tips, you'll be fine."; "We all know what happened to Rodney King, but Rodney wouldn't've got his ass kicked if he had just followed this simple tip. When you see flashing police lights in your mirror, stop immediately. Everybody knows, if the police have to come and get you, they're bringing an ass kicking with 'em."; "If you have to give a friend a ride, get a white friend. A white friend can be the difference between a ticket and a bullet in ya'.".

- The video also shows numerous clips of multiple officers beating suspects.

- The Court in *Stewart* concluded that whatever the merits of this routine as comedy, "it is grossly inappropriate in the context of a police department's use of force training".

75.    The aforementioned de facto policies, practices, and customs of the Euclid Police Department include a pattern of acts of excessive use of force and malicious prosecution, and other willful, wanton, and/or reckless behavior, leading to harmful consequences to citizens, particularly African-American citizens as a class, of which Plaintiff Hubbard is a member.

76.    The Euclid Police Department has engaged in little or no meaningful disciplinary action in response to this pattern of misconduct, thereby creating a culture or

20

climate that members of the department can escape accountability with impunity.

77.     This pattern is the moving force behind the conduct of Defendant Officers in searching, seizing, and prosecuting Plaintiffs, which was not an isolated incident of unconstitutional policing within the City of Euclid by its officers.

78.     The policy, practice, and custom of a police code of silence results in police officers refusing to report instances of police misconduct of which they are aware, including unlawful searches, seizures, and prosecutions, despite their obligation under police regulations to do so, and also includes police officers either remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow officers from internal discipline, civil liability or criminal charges, in cases where they and their fellow officers engaged in misconduct.

79.     The de facto policies, practices and customs of failing to hire, train, supervise, monitor, discipline, transfer, counsel and/or control police misconduct and the code of silence are interrelated and exacerbate the effects of each other, to institutionalize police lying and immunize police officers from discipline.

80.     That the unconstitutional actions of Defendant Officers as alleged in this complaint were part and parcel of a widespread municipal policy, practice and custom is further established by the involvement in, and ratification of, these acts by municipal supervisors and policy makers, as well as by a wide range of other police officials, officers, and divisions of the Department.

81.     The policies, practices and/or customs alleged in this complaint, separately and together, are the proximate cause of the injury to Plaintiffs, because Defendant Officers had good reason to believe that his misconduct would not be revealed or reported by fellow officers or their supervisors, and that they were immune from disciplinary action, thereby protecting them from the consequences of their unconstitutional conduct.

82.     But for the belief that they would be protected, both by fellow officers and by the City of Euclid Police Department from serious consequences, Defendant Officers would not have engaged in the conduct that resulted in the injuries to Plaintiffs.

83.     The interrelated policies, practices and customs, as alleged in this complaint, individually and together, were maintained and implemented with deliberate indifference and encouraged Defendant Officers to commit the acts alleged in this complaint against Plaintiffs, and therefore acted as the moving forces behind the direct and proximate causes of the injuries to Plaintiffs.

**FOURTH CLAIM FOR RELIEF- State Law Claim for Willful, Wanton, and Reckless Conduct**

84.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully rewritten herein.

85.     Defendant Officers failed to exercise due care, and acted with a malicious purpose and/or in bad faith and/or in a willful and/or wanton and/or reckless manner

while engaged in police functions and activities, including but not limited to

unreasonable search and seizure and malicious prosecution against Plaintiffs.

86.     Defendant Officers, as set forth herein, engaged in negligent, reckless,

and/or willful and/or wanton misconduct such that they are not entitled to the immunities

set forth in O.R.C. § 2744.01 *et seq*.

87.     Defendant Officers acted under color of state law and within the scope of

his employment when he took these actions.

88.     As a direct and proximate cause of Defendant Officers' misconduct,

Plaintiffs' suffered and continue to suffer injuries and damages as set forth in this

Complaint.

**FIFTH CLAIM FOR RELIEF- State Law Claim for Malicious Prosecution**

89.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if

fully rewritten herein.

90.     In the manner described more fully above, Defendants, acting maliciously,

individually, jointly, and in conspiracy with each other, instituted, participated in, or

continued the prosecution of Plaintiffs' without probable cause.

91.     As a consequence of the criminal prosecution, Plaintiffs Hubbard and

Tirado were unlawfully seized and deprived of liberty.

92.     Both Plaintiffs' prosecutions were terminated in their favor when the case

against them were dismissed.

93.     The actions of Defendants were committed intentionally, maliciously, culpably, in bad faith, and/or in a willful, wanton, or reckless manner.

94.     Defendants acted in reckless disregard of Plaintiffs' rights.

95.     As a direct and proximate cause of this malicious prosecution, Plaintiffs suffered injuries, including but not limited to, loss of liberty, emotional distress, loss of reputation, and other damages set forth in this Complaint.

96.     Defendants acted under color of state law and within the scope of their employment when they took these actions.

**SIXTH CLAIM FOR RELIEF- State Law Claim for Assault and Battery**

97.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully rewritten herein.

98.     The actions of Defendant Officers towards Plaintiffs created in them the fear and apprehension of an immediate, harmful, and offensive touching and constituted a harmful touching, knowingly and without legal justification.

**SEVENTH CLAIM FOR RELIEF- State Law Claim for Intentional Infliction of Emotional Distress**

99.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully rewritten herein.

100.    Defendant Officers engaged in extreme and outrageous behavior as alleged in this complaint.

101.    Defendant Officers intended such conduct to inflict such severe emotional

24

distress upon Plaintiffs and knew his conduct would cause Plaintiffs severe and serious emotional distress, which was of a nature that no reasonable person could be expected to endure.

102.    Defendant Officers' conduct did, in fact, cause such distress.

103.    As a direct and proximate result of Defendant Officers' outrageous conduct, Plaintiffs were injured and suffered actual damages.

**EIGHTH CLAIM FOR RELIEF- Excessive Force: Amiott**

104.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully rewritten herein.

105.    The actions of Defendant Amiott constitute an unlawful and excessive use of force without legal justification.  Amiott's actions were willful, malicious, deliberately indifferent, reckless, wanton and shocking to the conscience, all of which deprived Plaintiff Richard Hubbard of his civil rights as secured by the Fourth and Fourteenth Amendments to the United States Constitution and through 42 U.S.C. §1983.

106.    Defendant Amiott's actions were committed maliciously and/or in a reckless, unreasonable, willful and wanton manner.

107.    As a direct and proximate cause of Officer Amiott's unlawful acts as set forth herein, Plaintiff Richard Hubbard suffered physical injuries and emotional distress.

**NINTH CLAIM FOR RELIEF- Excessive Force: Gilmer**

108.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if

fully rewritten herein.

109.    The actions of Defendant Gilmer constituted an unlawful and excessive use of force without legal justification.  Gilmer's actions, including but not limited to holding Plaintiff Richard Hubbard down so that Defendant Officer Amiott could continue his unlawful beating, were willful, malicious, deliberately indifferent, reckless, wanton and shocking to the conscience, all of which deprived Plaintiff Richard Hubbard of his civil rights as secured by the Fourth and Fourteenth Amendments to the United States Constitution and through 42 U.S.C. §1983.

110.    Defendant Gilmer's actions were committed maliciously and/or in a reckless, unreasonable, willful and wanton manner.

111.    As a direct and proximate cause of Officer Gilmer's unlawful acts as set forth herein, Plaintiff Richard Hubbard suffered physical injuries and emotional distress.

**TENTH CLAIM FOR RELIEF- Excessive Force: Pavkov**

112.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully rewritten herein.

113.    The actions of Defendant Pavkov constituted an unlawful and excessive use of force without legal justification.  Pavkov's actions, including but not limited to kneeing Plaintiff Richard Hubbard in the arm and wrenching his arm, were willful, malicious, deliberately indifferent, reckless, wanton and shocking to the conscience, all of which deprived Plaintiff Richard Hubbard of his civil rights as secured by the Fourth

26

and Fourteenth Amendments to the United States Constitution and through 42 U.S.C. §1983.

114.    Defendant Pavkov's actions were committed maliciously and/or in a reckless, unreasonable, willful and wanton manner.

115.    As a direct and proximate cause of Officer Pavkov's unlawful acts as set forth herein, Plaintiff Richard Hubbard suffered physical injuries and emotional distress.

**ELEVENTH CLAIM FOR RELIEF- Failure to Intervene: Gilmer and Pavkov**

116.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully rewritten herein.

117.    Defendants Gilmer and Pavkov observed Officer Amiott violating Plaintiff Richard Hubbard's civil rights.  Both Defendant Gilmer and Pavkov had the opportunity and the ability to prevent and/or curtail Officer Amiott's unlawful actions.  Despite having both the knowledge of unlawful behavior as well as the opportunity to prevent and/or curtail Officer Amiott's actions, neither Officer Gilmer nor Officer Pavkov did anything to prevent or curtail it.

118.    In this regard, Officer Gilmer and Officer Pavkov violated Plaintiff Richard Hubbard's civil rights as secured by the Fourth and Fourteenth Amendments to the United States Constitution and through 42 U.S.C. §1983.

119.    These Defendants acted maliciously and/or in a reckless, unreasonable, willful and wanton manner.

120.     As a direct and proximate cause of Officer Gilmer and Officer Pavkov's failure to intervene as set forth herein, Plaintiff Richard Hubbard suffered physical injuries and emotional distress.

**TWELVETH CLAIM FOR RELIEF - First Amendment Retaliation**

121.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully rewritten herein.

122.     As set forth herein, once Defendant Amiott noticed that Plaintiff Yolimar Tirado was recording the arrest, he ordered Defendant Pavkov to arrest Plaintiff Tirado. Following the command, Plaintiff Tirado took several steps away from the scene, and placed her hands in the air. Defendant Pavkov then grabbed Plaintiff Tirado's arms, pushed her down to the ground, and handcuffed her.

123.     Plaintiff Tirado's actions in recording Plaintiff Hubbard's arrest was not unlawful and it did not interfere with Plaintiff Hubbard's arrest.  Nothing Plaintiff Tirado said or did interfered with the arrest of Plaintiff Hubbard.  Plaintiff Tirado's actions and words were all speech as defined by and protected by the First Amendment to the United States Constitution.

124.     Defendant Officer Amiott's and Defendant Officer Pavkov's actions constitute an unlawful retaliation against Plaintiff Tirado based on her exercising of First Amendment free speech.  Plaintiff Tirado was manhandled, arrested and prosecuted for protected conduct rather than any illegal activity.

125.     As a direct and proximate cause of Officer Amiott and Officer Pavkov's unlawful retaliation against Plaintiff Yolimar Tirado, Plaintiff Tirado suffered losses, damages and emotional distress.

### THIRTEENTH CLAIM FOR RELIEF - False Arrest

126.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully rewritten herein.

127.     Based on the foregoing facts, Defendant Officers Amiott, Gilmer and Pavkov unlawfully arrested Plaintiffs Richard Hubbard and Yolimar Tirado as said arrests were accomplished without probable cause or other lawful justification.

128.     The Defendants' arrests, detentions, searches and seizures of Plaintiffs Hubbard and Tirado were violations of the Plaintiffs' rights as secured by the Fourth and/or Fourteenth Amendments to the United States Constitution.

129.     As a direct and proximate result of the Defendants' unlawful arrests of Plaintiff Hubbard and Plaintiff Tirado, these Plaintiffs suffered losses, damages and emotional distress.

### FOURTEENTH CLAIM FOR RELIEF - Negligent Hiring, Training, Retention and/or Supervision

130.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully rewritten herein.

131.     Defendant City of Euclid negligently failed to screen and negligently hired their employees and/or agents.  This failure and negligence led to the hiring of

individuals who should not have been given the legal authority to arrest individuals. Specifically, Officer Amiott's work history, including but not limited to being forced to resign from the City of Mentor Police Department for dishonesty, put the City of Euclid on notice that they should not hire Officer Amiott as a police officer.

132.    Thereafter, and as set forth herein, the City of Euclid failed in their legal obligation to train their police officers. The City of Euclid's failure to adequately train their officers was a direct and proximate cause of Plaintiffs' damages and injuries.

133.    The City of Euclid also unlawfully retained and supervised Officer Amiott. Officer Amiott's beleaguered employment with the City of Euclid constituted actual notice of police misconduct such that the City of Euclid is responsible for unlawfully retaining him. The City of Euclid finally subjected Officer Amiott to proposed discipline, but only *after* he violated Plaintiff Hubbard and Tirado's rights. Prior to the incident at issue, Officer Amiott had been involved in the multiple other incidents involving the violation of citizen's civil rights. Some of those incidents include:

- Violating Mr. Erimius Spencer's rights on December 5, 2016 by kicking him in the eye while Spencer was restrained with such force that it fractured Spencer's orbital bone. The City of Euclid was well aware of Officer Amiott's misconduct based, in part, on the extensive amount of publicity surrounding this matter;

-       Violating a juvenile's rights when she was in the Euclid Public Library on April 13, 2017.  This incident was also caught on video and received widespread media attention;

-       Violating Mr. Shawn George's civil rights on July 31, 2017 by falsely arresting Mr. George, pepper-spraying him and smashing his head onto a Euclid patrol vehicle.

134.    As a direct and proximate result of the City of Euclid's failure to adequately hire, train, retain and supervise their employees, Plaintiffs Richard Hubbard and Yolimar Tirado sustained injuries, damages, emotional distress and other losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Richard Hubbard, and Yolimar Tirado, demand that judgment be entered in their favor on all counts and prays the Court award the following relief:

A. $3.8 Million Dollars in compensatory damages for the violation of Plaintiffs' rights;

B. Punitive damages in an amount to be determined at trial for the willful, wanton, malicious, and reckless conduct of Defendants;

C. Declaratory and injunctive relief against the City of Euclid enjoining policies, practices, and customs shown to encourage the use of excessive and unreasonable force against civilians, and ordering the institution of policies, procedures, and

training for the Euclid Police Department to bring them into compliance with

constitutional standards;

D.  Attorney fees and the costs of this action and other costs that may be associated

with this action pursuant to 42 U.S.C. Section 1988; and

E.  All other relief which this Honorable Court deems equitable and just.


**JURY DEMAND**

Plaintiffs demand a trial by jury pursuant to United States Federal Law and Ohio Rule of

Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

*/s/Christopher McNeal, Esq.*
CHRISTOPHER MCNEAL, ESQ. (#0096363)
MCNEAL LEGAL SERVICES, LLC.
5333 Northfield Road, Suite 300
Bedford Heights, Ohio  44146
(216) 865-5625 – Telephone
chris@mcneallegalservices.com - Email

*/s/  Paul J. Cristallo, Esq.*
PAUL J. CRISTALLO, ESQ.  (#0061820)
THE LAW OFFICE OF PAUL J. CRISTALLO
The Brownhoist Building
4403 St. Clair Avenue
Cleveland, Ohio  44103
T:  440.478.5262
F:  216.881.3928
paul@cristallolaw.com

*Attorneys for Plaintiffs Richard Hubbard and
Yolimar Tirado*